UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LESTER A. BULL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-00609-SRC |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**<u>Memorandum and Order</u>**

Lester Bull asks the Court to set aside, correct, or vacate his sentence under 28 U.S.C.

§ 2255.  He argues that ineffective assistance of counsel occurred because his counsel allegedly

(1) failed to advise him on the effects of pleading guilty and the impact of relevant conduct under

the sentencing guidelines, (2) failed to secure a critical defense witness for sentencing, (3) failed

to maintain objections to the drug-quantity findings at sentencing, (4) failed to challenge drug-

quantity findings at sentencing, and (5) failed to object to a leadership enhancement at

sentencing.  He also asserts that the cumulative impact of his counsel's errors warrants

resentencing or an evidentiary hearing.  The Court takes up Bull's arguments below.

**I.     Background**

**A.     Factual background**

Bull's presentence investigation report contains the following facts relevant to Bull:

> The investigation of the instant offense was conducted by the Drug Enforcement
> Administration (DEA) and other government agencies and revealed that beginning
> at a time unknown but including June 2016 through October 2020, Lester A. Bull,
> Charles Strozier, Lorenzo Johnson, Mario C. Thomas[,] and Lance L. Madkins
> were involved in a conspiracy to distribute and possess with the intent to distribute
> controlled substances including methamphetamine, cocaine, fentanyl, heroin[,] and
> marijuana in the St. Louis, Missouri metropolitan area.

According to government records, in October 2016, the United States Postal Inspection Service in St. Louis, Missouri began identifying suspicious United States Postal Service Money Orders. The money orders appeared to be structured to avoid reporting requirements as they did not exceed $1,000.00. Additionally, the money orders were primarily in round dollar amounts and were purchased at multiple U.S. post offices on the same day. A large number of the USPS money orders coincided with USPS Priority Mail Express packages that were mailed to Lester and Rita Bull's residence located at 2465 Mountain Brook Drive, Hacienda Heights, California; DuShawn Landers['s] business, Paris Trucking, located at 3006 South Vermont Avenue, Los Angeles, California[;] and 4924 Balboa Boulevard, Encino, California.

. . .

On October 8, 2020, investigators established surveillance around 36 Patricia Avenue, Ferguson, Missouri, a residence known to be utilized by Lester Bull and Charles Strozier to store and distribute large quantities of narcotics. Investigators observed multiple unidentified individuals coming and going from the residence consistent with drug sales.

On October 8, 2020, surveillance was conducted at 36 Patricia Avenue, Ferguson, Missouri. A male, later identified as Lorenzo Johnson, was seen entering a black GMC Terrain and leaving the residence. The driver was observed making several traffic violations so a St. Ann, Missouri police officer was requested to make a traffic stop. Upon attempting to stop the vehicle, the driver fled at a high rate of speed and subsequently crashed. The driver fled on foot and was eventually taken into custody. A search of the vehicle resulted in the seizure of a Taurus, 9mm, G-2c firearm with a fully loaded magazine which was previously reported stolen to the Florissant, Missouri Police Department, a Taurus, 9mm, PT111 G2 firearm with a fully loaded magazine which was previously reported stolen to the St. Louis, Missouri Metropolitan Police Department, three packages containing suspected methamphetamine, three packages containing suspected cocaine, numerous Oxycodone prescription pills and five bags of suspected marijuana.

On October 9, 2020, believing a large quantity of crystal methamphetamine and several firearms were still located inside 36 Patricia Avenue, Ferguson, Missouri, investigators again conducted surveillance. Investigators observed Lance Madkins arrive at the address in a grey Dodge Ram and enter the residence. A short time later, Lance Madkins exited the residence and investigators observed a brick[-]like shape protruding from under his shirt. Lance Madkins drove to a local business where he parked next to a black Dodge Magnum. A male, later identified as Stanford Dickens, exited the Dodge Magnum and entered Lance Madkins vehicle. Lance Madkins then drove off. Investigators requested a St. Ann, Missouri police officer to conduct a traffic stop on the grey Dodge Ram. Upon initiating a traffic stop, the officer exited his patrol vehicle; however, Lance Madkins fled. The Dodge Ram eventually stopped, and Lance Madkins and Stanford Dickens were

taken into custody. Investigators retraced the route taken by Lance Madkins and discovered a clear plastic bag containing 445.83 grams of crystal methamphetamine on the shoulder of the interstate.

On October 9, 2020, officers observed Lester Bull, exit 36 Patricia Avenue, Ferguson, Missouri, and look up and down the street as if looking for law enforcement. Investigators approached Lester Bull[,] who fled on foot. Lester Bull was eventually located, hiding several blocks from the residence. Officers informed Lester Bull of their investigation and advised of the impending search at 36 Patricia Avenue, Ferguson, Missouri. Lester Bull denied any knowledge of illegal narcotics, firearms[,] or large sums of U.S. currency located in the residence. Lester Bull admitted to owning the residence; however, he reported Charles Strozier lived there.

On October 9, 2020, investigators conducted a federal search warrant at 36 Patricia Avenue, Ferguson, Missouri. The search revealed 40 individual packages of crystal methamphetamine, three clear plastic bags containing crystal methamphetamine, five separate bags containing marijuana, an AR-15 rifle loaded with 40 rounds of ammunition, a 12[-]gauge shotgun (with a defaced serial number) loaded with 4 shotgun shells, assorted gun magazines and ammunition, $9,163.01 in U.S. currency, paperwork addressed to Lester Bull and Charles Strozier, an ounce drug press[,] and a kilogram drug press.

On October 12, 2020, following receipt of information regarding one of Lester Bull's stash houses located at 15 Columbus Square, St. Louis, Missouri, a search was conducted. Investigators found a quantity of marijuana, a .45[-]caliber Rossi Bolt Action Rifle loaded with four rounds of ammunition, a .45[-]caliber STI International handgun loaded with eight rounds of ammunition, paperwork addressed to Lester Bull[,] and suspected drug ledgers. Further investigation led officers to believe seven pounds of methamphetamine were hidden at 15 Columbus Square, St. Louis, Missouri next to the washer and dryer where it would be necessary to remove a board to gain access; however, it was not found.

Investigation determined Lester Bull was renting 36 Patricia Avenue, Ferguson, Missouri to Charles Strozier, who previously made an agreement with an individual known as "Rich" to store methamphetamine there. Lester Bull sent multiple pounds of marijuana from Los Angeles, California and Fresno, California to St. Louis, Missouri four to five times a month with most shipments containing 10 pounds or more. Lester Bull would then either mail the proceeds back to Los Angeles, California or carry it on a plane. Lester Bull most recently, gave Mitch Foy two loads of over $164,000 each, to transport back to California.

Lester Bull provided Lance Madkins and Lorenzo Johnson methamphetamine to sell. The methamphetamine was kept at 36 Patricia Avenue, Ferguson, Missouri, in the basement inside a locked storage closet which Lester Bull and Charles Strozier both had a key for.

Lester Bull and Charles Strozier obtained five kilograms of cocaine in February 2020 from Fresno, California. Mitch Foy transported the cocaine to Lester Bull and then he and Charles Strozier used the drug presses to "stretch out" the kilograms. Lester Bull would add a "cut" substance in order to make a larger profit.

Lester Bull frequently flew to California, purchased marijuana, mailed it to various locations in St. Louis, Missouri, then flew back to St. Louis, Missouri where he would sell the marijuana. Lester Bull sent between two and four packages a month, for the last several years, which contained approximately two pounds of marijuana each. With regard to money laundering, Lester Bull would purchase money orders at various post offices, gas stations and other financial institutions in the St. Louis, Missouri area and then mail them back to California. The USPIS identified many of the payee and/or payors as DuShawn Landers, Rita Bull, Paris Trucking, Lester Bull, Charles Strozier, Mario Thomas[,] and others known and unknown to the investigation. Paris Trucking was a front company and was used to conceal the origin of proceeds derived from drug distribution and trafficking. The USPIS identified approximately $526,000.00 in United States Postal Service money orders that had been purchased and negotiated by the Lester Bull Drug Trafficking Organization.

As to the relevant conduct of Lester Bull, the amount of controlled substances involved in the conspiracy attributable to him as a result of his own conduct and the conduct of other conspirators reasonably foreseeable to him is 20.37 kilograms of a mixture or substance containing a detectable amount of methamphetamine, 5 kilograms of a mixture or substance containing a detectable amount of cocaine, at least 2.5 kilograms of fentanyl[,] and 225 kilograms of marijuana. The defendant purchased marijuana in California and then mailed it to various addresses in St. Louis, Missouri and also transported the marijuana via truck. Bull purchased money orders using proceeds from drug sales. Additionally, Bull maintained various homes throughout the conspiracy to store narcotics and the proceeds of narcotic sales and directed others in the sale of narcotics.

According to the government, Lester Bull is most culpable. Second and equal in culpability are Lorenzo Johnson, Charles Strozier and Lance Madkins. Third in culpability is Mario Thomas.

On October 10, 2020, Bull was taken into custody by the DEA. On October 15, 2020 Bull was transferred into custody of the United States Marshals Service in St. Louis, Missouri. No state charges were issued.

Final Presentence Investigation Report at ¶¶ 8–9, 24–36, *United States v. Bull*, No. 4:20-cr-00691-SRC-1 (E.D. Mo. Jun. 14, 2022), doc. 321 ("Crim. doc.").

    **B.**        **Procedural background**

        **1.**        **Criminal proceedings**

In October 2020, a task-force officer with the Drug Enforcement Administration filed a criminal complaint against Bull, alleging that he conspired with others to possess with the intent to distribute over 500 grams of a mixture of substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Crim. doc. 1 at 1 (The Court cites to page numbers as assigned by CM/ECF.).  About a month later, a grand jury indicted Bull with (1) conspiracy to distribute controlled substances (including methamphetamine, cocaine, fentanyl, heroin, and marijuana) in violation of 21 U.S.C. § 841(a)(1); (2) conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956 and 1957; (3) possession of firearms in furtherance of a drug-trafficking crime in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A); and (4) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2).  Crim. doc. 57 at 1–7.

The Court originally set this case for a jury trial beginning on February 28, 2022.  *See* crim. doc. 249.  But after Bull signed a written plea agreement, the Court scheduled a change-of-plea hearing for February 16, 2022.  Crim. docs. 252, 257–58.  During this hearing, however, Bull withdrew his guilty-plea agreement and decided to proceed to trial, so the Court converted the proceeding from a change-of-plea hearing to a *Frye* hearing.  *See* crim. doc. 257; crim. doc. 302, *Frye* Hr'g Tr. at 10:11–10:12, 16:9–16:11.  The Court then held a second *Frye* hearing on February 23, 2022, crim. doc. 282, during which Bull reaffirmed his desire to proceed to trial, crim. doc. 354, *Frye* Hr'g Tr. at 35:12–35:23.  But then, on the morning of the first day of trial, Bull decided to plead guilty without a plea agreement, instead executing a stipulation of facts admitting to the elements of the offenses.  *See* crim. docs. 298–99; crim. doc. 356, Plea Hr'g Tr. at 16:5–17:5, 37:2–37:5.  Specifically, Bull pleaded guilty to conspiring to distribute 100

kilograms or more of marijuana while disputing his responsibility for other controlled

substances.  *See* crim. doc. 299; crim. doc. 356, Plea Hr'g Tr. at 17:23–19:12.  He also pleaded

guilty to the remaining charges.  *See* crim. doc. 356, Plea Hr'g Tr. at 19:13–24:5.  Before Bull

formally entered his guilty plea, the United States indicated that it intended to introduce evidence

at sentencing that Bull's participation in the drug conspiracy involved fentanyl, cocaine, and

methamphetamine in addition to marijuana.  *Id.* at 3:23–4:7.  And before pleading guilty, Bull

informed the Court that he was satisfied with his counsel's performance:

| | |
|---|---|
| **THE COURT:** | Right.  And so what I'm going to focus on here is just since Mr. Schoeneberg and Mr. Harvath have been your attorneys. Do you have any complaint against them for anything they've done or failed to do or anything else at all in this case? |
| **[BULL]:** | No. |
| **THE COURT:** | Are you fully satisfied with the services that Mr. Harvath and Mr. Schoeneberg have provided for you in this case? |
| **[BULL]:** | Yes, Your Honor. |
| **THE COURT:** | And has your change in counsel resolved any issues and satisfied any concerns you had about your prior counsel, Mr. Williams? |
| **[BULL]:** | My change in counsel—this counsel that I have has been doing a marvelous job . . . . |

*Id.* at 9:13–10:2.

The United States Probation Officer prepared a Presentence Investigation Report (PSR).

Crim. doc. 321.  The PSR calculated Bull's total offense level as 42 and his criminal-history

category as II.  *Id.* at ¶¶ 50, 59.  Based on that total offense level and criminal-history

categorization, the imprisonment range under the Sentencing Guidelines was 360 months to life.

*Id.* at ¶ 91.

The Court held a sentencing hearing in June 2022.  Crim. doc. 331.  Bull orally moved to continue his sentencing until after the sentencing of his codefendant, Charles Strozier, but the Court denied the motion without prejudice.  Crim. doc. 358, Sent'g Hr'g Tr. at 4:15–4:25, 28:9–28:13.  After the Court ruled on the continuance motion, *id.* at 28:9–28:13, Bull reaffirmed that he was satisfied with his counsel's performance:

| | |
|---|---|
| **THE COURT:** | And when you pled guilty, you told me you were fully satisfied with the services that Mr. Harvath and Mr. Schoeneberg have performed for you in this case.  Since then have you had enough time to talk with them and have them answer any questions you've had about this case? |
| **[BULL]:** | Yes, Your Honor.  I just wanted the truth to come out. |
| **THE COURT:** | And do you remain fully satisfied with the services that they have performed for you in this case? |
| **[BULL]:** | Yes. |

*Id.* at 29:1–29:10.

The United States presented evidence regarding Bull's alleged involvement with controlled substances other than marijuana, while Bull presented evidence trying to disprove this involvement.  *See id.* at 36:5–126:9.  The Court found that Bull was responsible for other drugs in addition to marijuana.  *See id.* at 137:19–138:1.  The Court also applied a leadership enhancement, accepted the parties' stipulated facts, overruled Bull's objections to the PSR, and adopted the guidelines range in the PSR.  *See id.* at 138:2–138:10, 141:16–141:25, 142:10–142:14, 150:12–150:18.  The Court then sentenced Bull to 360 months—300 months on Count 1, 120 months on Counts 2 and 5 (to run concurrently with Count 1), and 60 months on Count 3 (to run consecutively to all other counts).  Crim. doc. 334 at 2.  The Court also sentenced Bull to a five-year term of supervised release.  *Id.* at 3.

Bull appealed his sentence, crim. doc. 338, and the Eighth Circuit affirmed, crim. doc. 430; *see also United States v. Bull*, No. 22-2417, 2024 WL 378006 (8th Cir. Feb. 1, 2024).  Bull is currently serving his sentence at FCI Sheridan in Oregon with a projected release date of May 4, 2046.  *See* Find an inmate, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Aug. 7, 2026).

### 2.     Civil proceedings

In April 2025, Bull timely filed a motion to vacate his sentence pursuant to section 2255. *See Bull v. United States*, No. 4:25-cv-00609-SRC (E.D. Mo. Apr. 29, 2025), doc. 1 ("Civ. doc.").  He makes six arguments, all involving ineffective assistance of counsel.  Bull argues that his counsel rendered ineffective assistance by (1) failing to advise him on the effects of pleading guilty and the impact of relevant conduct; (2) failing to secure a critical defense witness for sentencing; (3) failing to maintain objections to drug-quantity findings; (4) failing to challenge the non-marijuana drug-quantity findings; and (5) failing to object to the leadership enhancement.  Civ. doc. 1 at 4–14.  Bull also argues that the cumulative impact of his counsel's errors warrants resentencing or an evidentiary hearing.  *Id.* at 14.  The United States filed its response, civ. doc. 13, and Bull filed his reply brief, civ. doc. 17, as well as a supplemental brief, civ. doc. 18.  Both parties filed affidavits in support of their arguments.  *See* civ. doc. 1-1 at 32–40; civ. doc. 13-1; civ. doc. 13-2.  Bull's motion is now ripe for the Court's review.

## II.     Standard

### A.     Section 2255

Under section 2255, a federal prisoner "may move the court which imposed [his] sentence to vacate, set aside or correct the sentence" on the grounds that the court imposed "the sentence . . . in violation of the Constitution or laws of the United States, or that the court was

8

without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).  If a petitioner claims his sentence violates the Constitution or laws of the United States, the petitioner must establish that the violation constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Gomez*, 326 F.3d 971, 974 (8th Cir. 2003) (first quoting *United States v. Boone*, 869 F.2d 1089, 1091 n.4 (8th Cir. 1989); and then citing Fed. R. Crim. P. 32(d) advisory committee notes to the 1983 amendments).  Generally, to obtain section 2255 relief based on a claim, a petitioner must have raised the underlying error on direct appeal.  *See Roundtree v. United States*, 885 F.3d 1095, 1097 (8th Cir. 2018).  If a petitioner failed to do so, the Court considers the claim procedurally defaulted, rendering it ineffective in establishing a right to section 2255 relief.  *See id.*

Three exceptions to this general rule exist.  First, "if the error is jurisdictional, the error may be raised on collateral review without being subjected to procedural[-]default analysis." *United States v. Mooring*, 287 F.3d 725, 727 (8th Cir. 2002).  Second, if a petitioner raises a constitutional claim, the Court does not consider the claim procedurally defaulted if the petitioner shows cause for the default and actual prejudice.  *See Anderson v. United States*, 25 F.3d 704, 706 (8th Cir. 1994); *Reid v. United States*, 976 F.2d 446, 448 (8th Cir. 1992).  This "cause and prejudice exception does not apply to nonconstitutional or nonjurisdictional claims that could have been but were not raised on direct appeal." *Anderson*, 25 F.3d at 706 (first citing *Brennan v. United States*, 867 F.2d 111, 120 (2d Cir. 1989); and then citing *Bontkowski v. United States*, 850 F.2d 306, 313 (7th Cir. 1988)).  Finally, the Court "will consider a claimed error that could have been raised at trial or on direct appeal if the alleged error was a fundamental miscarriage of justice." *Id.* (citing *Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993)

9

(per curiam)).  This exception, however, "applies only when a petitioner shows by clear and convincing evidence that, but for an alleged constitutional error, no reasonable juror would have found the petitioner guilty," *id.* at 706–07 (citing *Wallace v. Lockhart*, 12 F.3d 823, 827 (8th Cir. 1994)), and extends only to claims of factual innocence, *id.* at 707 (first citing *Narcisse v. Dahm*, 9 F.3d 38, 40 (8th Cir. 1993); and then citing *Ramey*, 8 F.3d at 1314).

If the petitioner's claims are not procedurally barred, the Court must hold an evidentiary hearing to consider the claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *see also Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994).  A petitioner is entitled to an evidentiary hearing "when the facts alleged, if true, would entitle [the petitioner] to relief."  *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996) (quoting *Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986)).  However, a court may dismiss a claim without a hearing "if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based."  *Shaw*, 24 F.3d at 1043 (citing *Larson v. United States*, 905 F.2d 218, 220–21 (8th Cir. 1990)).

## B.      Ineffective assistance of counsel

A petitioner may raise an ineffective-assistance-of-counsel claim for the first time in a section 2255 motion, even if he could have raised the same claim on direct appeal.  *Massaro v. United States*, 538 U.S. 500, 504 (2003).  This exception to the procedural-default rule exists to prevent petitioners from being forced "to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim."  *Id.*  Additionally, a petitioner's attorney may serve as counsel for both trial and appellate proceedings, and it is unlikely that the attorney would raise a claim of his own ineffective assistance on appeal.  *See United States v. Rashad*, 331 F.3d 908, 911 (D.C. Cir. 2003).

To establish ineffective assistance of counsel, a petitioner "faces a heavy burden." *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (quoting *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996)).  He must show both that his counsel's performance was deficient and that the deficient performance prejudiced the petitioner's case.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Sera*, 267 F.3d 872, 874 (8th Cir. 2001). An attorney's performance is deficient only if it falls "below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687–88; *see also Sera*, 267 F.3d at 874.  Two substantial impediments exist to making such a showing.  First, "a 'strong presumption'" exists "that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689). Second, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Id.* (quoting *Strickland*, 466 U.S. at 690).

To satisfy *Strickland*'s prejudice element in the guilty-plea context, the petitioner must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Covington v. United States*, 739 F.3d 1087, 1090 (8th Cir. 2014) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Importantly, "[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Thompson v. United States*, 872 F.3d 560, 567 (8th Cir. 2017) (quoting *Lee v. United States*, 582 U.S. 357, 369 (2017)).  Instead, courts should "look to contemporaneous evidence to substantiate a defendant's expressed preferences."  *Id.* (quoting *Lee*, 582 U.S. at 369).  And to establish prejudice in the sentencing context, the petitioner must show "a reasonable probability that his

11

sentence would have been different but for the deficient performance." *Jeffries v. United States*, 721 F.3d 1008, 1014 (8th Cir. 2013) (citing *Puckett v. United States*, 556 U.S. 129, 142 n.4 (2009)).

## III.    Discussion

### A.    Whether Bull's counsel was ineffective for failing to advise him on the effects of pleading guilty

Bull first argues that his counsel's performance led him to make an unknowing and involuntary guilty plea. Civ. doc. 1 at 4. He cites several instances of counsel's allegedly deficient performance in support of this point. *See* civ. doc. 1-1 at 14–17.

#### 1.    Benefits of guilty-plea agreement

Bull asserts that counsel advised him to plead guilty "without the benefit of a plea agreement," thereby "inadvertently waiv[ing] his right to appeal critical constitutional violations, including those raised in his motions to suppress." Civ. doc. 1-1 at 14–15 (first citing *United States v. Dewberry*, 936 F.3d 803, 805–06 (8th Cir. 2019); and then citing *United States v. McHenry*, 849 F.3d 699, 706–07 (8th Cir. 2017)). He further argues that "[t]here was no explanation of the benefits of securing a plea agreement and what stipulations could have been preserved via a plea agreement." *Id.* at 15.

In support of these points, Bull submits an unsworn declaration to which he attests under penalty of perjury. *See id.* at 32–35. The Court treats this declaration as equivalent to an affidavit. *See* 28 U.S.C. § 1746. In this declaration, Bull states that he was "never informed of the advantages a plea agreement could provide, including the possibility of negotiating sentencing stipulations or preserving certain appellate rights." *Id.* at 32. Had he known this information, he asserts, he "would not have rejected the agreement offered." *Id.* Bull also avers that he was "unaware of the full legal implications of proceeding without a plea agreement," and

that he had "no communications with [his] attorney" due to COVID restrictions.  *Id.*  To counter

Bull's assertions, the United States submits affidavits from Bull's counsel, Mr. Schoeneberg and

Mr. Harvath.  *See* civ. docs. 13-1, 13-2.  In these affidavits, both attorneys state that Bull

understood the consequences of pleading guilty.  *See* civ. doc. 13-1 at 1 ("We clearly discussed

all of the ramifications of pleading guilty or going to trial."); civ. doc. 13-2 at 2 ("Mr. Bull knew

. . . the consequences of his plea.").

The Court recognizes that it "is not permitted to make a credibility determination on the

affidavits alone."  *United States v. Sellner*, 773 F.3d 927, 929 (8th Cir. 2014).  But the Court

need not determine which affiant is most credible, because it finds that the record otherwise

belies Bull's claims.  Before Bull pleaded guilty on February 28, 2022, the Court ensured that

Bull—who was under oath—understood that a guilty plea would forfeit Bull's right to file any

motions to suppress and that he had discussed those consequences with his counsel:

| | |
|---|---|
| **THE COURT:** | Do you understand that by pleading guilty you will be giving up the right to file any pretrial motions, including motions to suppress evidence or any statements that you might have made? |
| **[BULL]:** | Yes. |
| **THE COURT**: | And did you discuss that decision with Mr. Harvath and Mr. Schoeneberg? |
| **[BULL]:** | Yes. |
| **THE COURT:** | And are you fully satisfied with the decision that you all have made about waiving pretrial motions? |
| **[BULL]:** | Yes. |

Crim. doc. 356, Plea Hr'g Tr. at 10:25–11:11.  As for Bull's claim that he received no

explanation of the benefits of a plea agreement, the record again indicates otherwise.  When Bull

13

decided to forgo his signed plea offer and proceed to trial, he told the Court that he made that decision after speaking with his attorneys and considering all the terms of the plea agreement:

> **THE COURT:**     And so it's your decision to proceed to trial; correct?
>
> **[BULL]:**        Yes.
>
> **THE COURT:**     And you have made that decision after considering all of the terms of this Plea Agreement; right?
>
> **[BULL]:**        Yes.
>
> **THE COURT:**     And you have made that decision after talking with your attorneys not only about this Plea Agreement but about your decision to proceed to trial?
>
> **[BULL]:**        Yes.

Crim. doc. 302, *Frye* Hr'g Tr. at 16:9–16:18.  The Court also explained to Bull what would happen if he later decided to plead guilty without a plea agreement, and Bull indicated that he understood:

> **THE COURT:**     [Y]ou can plead guilty before trial without any plea agreement.  That means you'd be pleading guilty to the charges in the indictment and you would be subjecting yourself—you would have no agreement with the United States with respect to sentencing.  You would have no agreement with the United States with respect to the sentencing guidelines.  You would have no agreement of any nature that is set forth in this Plea Agreement or any such agreement that you earlier discussed with the United States or your attorneys.  Do you understand that?
>
> **[BULL]:**        Yes.

*Id.* at 17:14–17:24.

"A defendant's representations during the plea-taking carry a strong presumption of verity and pose a formidable barrier in any subsequent collateral proceedings." *Adams v. United*

14

*States*, 869 F.3d 633, 635 (8th Cir. 2017) (citation modified).  In his reply brief, Bull recognizes this principle but argues that on-the-record representations are not "'invariably insurmountable' when a petitioner later alleges specific off-the-record coercion or misadvice."  Civ. doc. 17 at 4 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74–75 (1977)).  The Court addresses Bull's claim of coercion below.

As to Bull's claim that counsel misadvised him, Bull does not point to a specific misrepresentation by counsel that Bull relied on when pleading guilty.  Rather, Bull argues that counsel failed to advise him about the consequences of pleading guilty at all.  *See id.* at 4–5; *see also* civ. doc. 1-1 at 32.  But importantly, as noted above, the Court explained these consequences to Bull before he pleaded guilty.  Thus, Bull cannot show prejudice, as he fails to show "that there is a reasonable probability that, but for *counsel's errors*, he would not have pleaded guilty and would have insisted on going to trial."  *Covington*, 739 F.3d at 1090 (emphasis added) (quoting *Hill*, 474 U.S. at 59); *see also United States v. Spencer*, 119 F. App'x 21, 23–24 (8th Cir. 2004) ("Even if we were to assume that Defendant's counsel failed to explain the agreement to the Defendant, this error did not prejudice the Defendant because the district court, prior to accepting the Defendant's guilty plea, specifically questioned him to ensure he understood the agreement . . . .").

Finally, as to Bull's argument that he inadvertently waived his right to appeal constitutional violations because of counsel's advising him to plead guilty without an agreement, the Court notes that Bull makes conflicting assertions in this regard.  In his memorandum in support of his motion to vacate, Bull indicates that, absent counsel's advice, he would not have pleaded guilty *at all*.  *See* civ. doc. 1-1 at 14–15 (noting that Bull "waived his right to appeal critical constitutional violations . . . that would have remained viable had he proceeded to trial").

15

But in his affidavit, Bull avers that, absent counsel's performance, he would not have rejected the *original plea agreement* the United States offered. *See* civ. doc. 1-1 at 32 (stating that Bull was "never informed of the advantages a plea agreement could provide, including . . . preserving certain appellate rights," otherwise Bull "would not have rejected the agreement offered"). Both arguments fail.

As to Bull's assertion that he would have accepted the United States' original plea agreement, the Court notes that this agreement would also have waived Bull's right "to appeal all non-jurisdictional, non-sentencing issues, including . . . any issues relating to pretrial motions, discovery and the guilty plea, the constitutionality of the statute(s) to which defendant is pleading guilty and whether defendant's conduct falls within the scope of the statute(s)." Crim. doc. 258 at 10. And as to Bull's indication that he may have proceeded to trial to preserve his right to appeal constitutional issues, the Court finds this to be nothing more than a "post hoc assertion" about how Bull would have pleaded but for his attorney's alleged deficiencies. *See Thompson v. United States*, 872 F.3d 560, 567 (8th Cir. 2017). The Court need not accept such an assertion and instead finds that the extensive and thorough "contemporaneous evidence" adduced at Bull's *Frye*, plea, and sentencing hearings substantiate Bull's desire to plead guilty in this case. *Id.*

Although the parties have submitted competing affidavits on this issue, "[a]n inmate is not automatically entitled to a trip back to the district court for an evidentiary hearing simply because he files an affidavit that conflicts on its face with the sworn statements of his attorney." *Adams*, 869 F.3d at 635. And the Court "may deny an evidentiary hearing if the movant's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" *Id.* (quoting *Thomas v. United States*,

16

737 F.3d 1202, 1206–07 (8th Cir. 2013)).  Here, the Court finds that the record contradicts Bull's allegations.  Bull is therefore not entitled to an evidentiary hearing on this ground.  *See id.*

### 2.    Mandatory five-year sentence

Bull next argues that his guilty plea was not fully informed and voluntary because "[h]e was not adequately advised that a plea to Count Three, under 18 U.S.C. § 924(c), would result in a mandatory five-year consecutive sentence."  Civ. doc. 1-1 at 15.  Bull does not include this specific point in his affidavit, *see* civ. doc. 1-1 at 32–35, but the United States relies on Mr. Schoeneberg's affidavit to counter Bull's argument, *see* civ. doc. 13 at 20; civ. doc. 13-1 at 1 ("I am certain that we discussed 18 U.S.C. [§] 924(c) and its corresponding penalty range as frankly no stone was left unturned in representing Mr. Bull.").  But the Court need not determine who is more credible, as the record again contradicts Bull's claims.

At Bull's second *Frye* hearing, the Court and defense counsel informed Bull of the range of punishment he faced:

| | |
|---|---|
| **THE COURT:** | One thing that I want to make sure that we know, we talk about and we have here is the discussions that you had with your lawyers about the length of term of imprisonment that you face in this case.  Did you have those discussions with your lawyers? |
| **[BULL]:** | Yes. |
| **THE COURT:** | And so, Counsel, having you—what is the range of punishment that Mr. Bull faces in this case if he is convicted on all counts. |
| **MR. SCHOENEBERG:** | Your Honor, that would be 360 months to life. |
| **THE COURT:** | So, Mr. Bull, do you understand that that's the range of punishment you face in this case. |
| **[BULL]:** | Yes. |

Crim. doc. 354, *Frye* Hr'g Tr. at 35:24–36:12.  The Court confirmed that Bull understood the range of punishment at his plea hearing:

| | |
|---|---|
| **THE COURT:** | So what we talked about before was that the range of —your guidelines range in this case could be 360 months of imprisonment to life in prison.  Do you understand that? |
| **[BULL]:** | Yes. |

Crim. doc. 356, Plea Hr'g Tr. at 34:7–34:11.

Also at the plea hearing, before Bull pleaded guilty, the Court informed Bull of the maximum fine range and term of imprisonment he faced for each count.  *See id.* at 27:9–29:14.  And when discussing the range of punishment for Count 3, the Court explained to Bull that he faced a mandatory minimum sentence of five years, and that this sentence would run consecutively to any other sentence:

| | |
|---|---|
| **THE COURT:** | Okay.  So if on Count 3 the only finding is with respect to marijuana, then there's a mandatory minimum sentence of 5 years that's consecutive to or in addition to any other sentence that I impose up to a term of 40 years which would that also be consecutive? |
| **MS. GRAVISS:** | Yes, Your Honor. |
| **THE COURT:** | So that would be any sentence from 5 to 40 years would be consecutive to or in addition to any other sentence I imposed.  Do you understand that? |
| **[BULL]:** | Yes. |

*Id.* at 28:6–28:15.  So even assuming Bull's counsel gave him erroneous advice about his sentencing exposure, this advice did not prejudice Bull, because the Court informed Bull of the sentence he faced.  *See United States v. Quiroga*, 554 F.3d 1150, 1155 (8th Cir. 2009) ("[I]naccurate advice of counsel about the sentencing guidelines or likely punishment does not

render involuntary a defendant's decision to plead guilty, so long as the defendant is informed of the maximum possible sentence permitted by statute and the court's ability to sentence within that range."); *Meza-Lopez v. United States*, 929 F.3d 1041, 1045 (8th Cir. 2019) (citing *Quiroga*, 554 F.3d at 1155).  And because the record contradicts Bull's claim, the Court need not hold an evidentiary hearing on this ground.  *See Adams*, 869 F.3d at 635; *Sellner*, 773 F.3d at 929–30.

### 3.    Uncharged drug quantities

Bull then argues that counsel did not adequately explain "how uncharged drug quantities—unsupported by physical evidence and based solely on testimonial inferences—could materially increase his sentencing exposure."  Civ. doc. 1-1 at 15.  He states that the plea record demonstrates that he "fundamentally misunderstood the scope and legal implications of the stipulation regarding marijuana."  *Id.*  According to Bull, he believed that the stipulation "pertained solely to financial disputes," rather than "acknowledging participation in a broader drug conspiracy" involving controlled substances other than marijuana.  *Id.* at 15–16.

To support these allegations, Bull points to his plea and sentencing hearings, arguing that (1) he "expressed surprise upon learning that his plea extended beyond marijuana-related conduct," (2) the Court and counsel "failed to adequately clarify that . . . additional drug quantities could still be considered at sentencing under the preponderance of the evidence standard," and (3) the Court failed to adequately explain the meaning of "additional relevant conduct."  *Id.* at 16.  Bull states that this misunderstanding prejudiced him, because the additional drug quantities increased his sentencing exposure from 108–135 months to the 300-month sentence he received.  *Id.*  And he asserts that, had counsel properly advised him, he "may have either pursued trial or sought a more favorable plea agreement."  *Id.*  Bull reiterates these arguments in his affidavit.  *See* civ. doc. 1-1 at 32–35.

To counter Bull's arguments, the United States points to Mr. Schoeneberg's affidavit. *See* civ. doc. 13 at 20; civ. doc. 13-1 at 2 ("Mr. Bull understood and acquiesced to the fact that additional drug quantities could still be considered at sentencing under the preponderance of the evidence standard.").

At the outset, the Court notes that Count 1 of the indictment charged Bull with conspiracy to distribute controlled substances, including "methamphetamine, cocaine, fentanyl, heroin, and marijuana."  Crim. doc. 57 at 1; *see also id.* at 2 (attributing certain amounts of methamphetamine, cocaine, and marijuana to Bull).  Thus, the drug quantities other than marijuana were not "uncharged," as Bull claims.  Civ. doc. 1-1 at 15.

Still, the Court finds that the record refutes Bull's argument.  For instance, at the plea hearing, the United States indicated its intent to introduce evidence at sentencing regarding Bull's participation in a conspiracy to distribute controlled substances other than marijuana, which Bull indicated that he understood:

| | |
|---|---|
| **THE COURT:** | So, Ms. Graviss, is it your intention at sentencing to put on evidence? |
| **MS. GRAVISS:** | Yes, Your Honor.  It would be my intention to put on evidence at sentencing to prove the government's position which is that the defendant was participating in a conspiracy to distribute fentanyl, cocaine and methamphetamine in addition to the marijuana. |
| **THE COURT:** | All right.  And, Mr. Harvath, is Mr. Bull aware of that? |
| **MR. HARVATH:** | Yes, Your Honor. |
| . . . | |
| **THE COURT:** | So, Mr. Bull, do you understand what you—you have heard everything your counsel was just saying; correct? |
| **[BULL]:** | Yes. |

| | |
|---|---|
| **THE COURT:** | Do you understand everything he was saying? |
| **[BULL]:** | Yes. |
| **THE COURT:** | And do you agree with everything he said? |
| **[BULL]:** | Yes, Your Honor. |
| **THE COURT:** | And then you heard what Ms. Graviss has said as well; correct? |
| **[BULL]:** | Yes. |
| **THE COURT:** | And you understand what she was saying? |
| **[BULL]:** | Yes, Your Honor. |
| **THE COURT:** | And you agree that that's what the United States intends to do at sentencing, to present evidence as to the other controlled substances alleged in the indictment? |
| **[BULL]:** | Yes, Your Honor. |

Crim. doc. 356, Plea Hr'g Tr. at 3:23–5:5.  Bull also confirmed that, other than the Stipulation of

Facts, there were no agreements, deals, or understandings that affected him in this case:

| | |
|---|---|
| **THE COURT:** | Did anyone force you to sign this Stipulation of Facts in any way? |
| **[BULL]:** | No. |
| **THE COURT:** | And so with this—other than this Stipulation of Facts, is there any—are there any other agreements, deals or understandings that exist or you believe exist in any way that affect you in this case? |
| **[BULL]:** | No. |
| **THE COURT:** | And other than this Stipulation of Facts, has anyone at any time made any other or different promises, representations or assurances to you to get you to sign this Stipulation of Facts? |
| **[BULL]:** | No. |

| THE COURT: | Or to enter a plea of guilty in this case? |
|---|---|
| [BULL]: | No. |

*Id.* at 16:15–17:5.

And after confirming that Bull agreed to everything in his Stipulation of Facts, the Court again confirmed that Bull understood that the United States intended to present evidence of additional drug quantities at sentencing:

| THE COURT: | All right. So with respect to relevant conduct, is the Stipulation of Facts essentially, Counsel, the sum total of the relevant conduct to which Mr. Bull is agreeing? |
|---|---|
| MR. HARVATH: | Yes, Your Honor. |
| THE COURT: | So, Mr. Bull, again, you've read the Stipulation of Facts and you agree that everything is true and correct in the Stipulation of Facts? |
| [BULL]: | Yes, Your Honor. |
| THE COURT: | And do you understand that by admitting these facts, you're agreeing that I can consider them and it's called relevant conduct; and I can consider that relevant conduct in determining your sentence in this case? |
| [BULL]: | Yes, Your Honor. |
| THE COURT: | Now, do you understand also, as we've been talking about, and I want to confirm this, that the United States intends to present evidence at the sentencing hearing of additional relevant conduct; and that if I do find that relevant conduct that the United States intends to present, and if I find that by a preponderance of the evidence, then I can consider that relevant conduct in connection with your sentencing as well? |
| [BULL]: | Yes, Your Honor. |

*Id.* at 24:6–25:3.

And while Bull did express some confusion regarding the scope of his Stipulation of Facts at sentencing, the Court allowed Bull sufficient time to speak with his counsel to clarify the issue:

| | |
|---|---|
| **[BULL]:** | I was under the impression that the agreement that we signed was—I thought it was strictly with the money, that we argue the money part of the case.  I didn't know it was the whole conspiracy thing.  I thought it was arguing the amount of money, and I know that I signed for the marijuana, which was over 100 kilos of marijuana and a gun. |
| **THE COURT**: | So I am going to have you talk with your attorneys about this because I'm not quite sure what it is you are saying.  Because you do not have a guilty plea agreement.  You chose—and we have covered this at the hearing in this case, the plea hearing, that you chose not to proceed with a guilty plea agreement.  You rejected the guilty plea agreement and you chose to proceed based on a stipulated set of facts.  So with that, the stipulated facts is Docket No. 299 and then there's a Stipulation of Facts Supplement, Docket 300.  But there is no guilty plea agreement in this case. |
| | Counsel, I'm going to have you talk with Mr. Bull and clarify what he's talking about here. |
| **[BULL]:** | (Conferring with counsel.) |
| **MR. HARVATH:** | Thank you, Your Honor. |
| **THE COURT:** | Okay. So, Mr. Bull, as I said, you do not have a plea agreement in this case, and you were answering the question of whether there's any agreement you think you have about sentencing. I mentioned that you have a stipulation of facts. All that is is an agreement upon that certain facts are true and need not be proven for purposes of sentencing. Do you understand that? |
| **[BULL]:** | Yes, Your Honor. |
| **THE COURT:** | Did you have enough time to talk with your attorneys just now? |
| **[BULL]:** | Yes. |
| **THE COURT:** | All right.  So with that, is there any agreement you believe you have about sentencing? |

23

| [BULL]: | No. |
| --- | --- |
| THE COURT: | And, Counsel, I will ask:  Are there any further objections based on your conversations with Mr. Bull just now? |
| MR. HARVATH: | No, Your Honor. |

Crim. doc. 358, Sent'g Hr'g Tr. at 33:5–34:19.

Bull's representations during his guilty-plea hearing "carry a strong presumption of verity."  *Adams*, 869 F.3d at 635.   His ambiguous statement at sentencing, later clarified during the hearing, does not surmount this hurdle.  *See Blackledge*, 431 U.S. at 74–75.  Because the record contradicts Bull's claim, the Court need not hold an evidentiary hearing on this ground. *See Adams*, 869 F.3d at 635; *Sellner*, 773 F.3d at 929–30.

### 4.        Exculpatory financial documents

Bull next argues that his guilty plea was involuntary because counsel "failed to present or utilize exculpatory financial documentation" that Bull provided.  Civ. doc. 1-1 at 15.  This documentation included "a USPS Inspector's report and a detailed ledger," which purportedly showed that Bull "was personally responsible for no more than $296,000 in transactions, contrary to the $526,000 alleged in support of the money laundering count."  *Id.*  Mr. Schoeneberg and Mr. Harvath state in their affidavits that they reviewed these documents and did not believe that they contradicted the United States' evidence.  *See* doc. 13-1 at 2 (Mr. Schoeneberg averring that he "did not believe that what [Bull] showed [him] in any way contradicted the USPS Inspector's report"); doc. 13-2 at 2 (Mr. Harvath stating that "[t]he financial documentation provided to us by Mr. Bull was reviewed extensively, and we agreed that it in no way did it contradict the evidence provided by the Government").

But the Court need not decide the credibility of these affidavits, because Bull conceded at sentencing that he laundered approximately $500,000 from marijuana sales:

**[MS. GRAVISS]:**   Right.   He didn't have money to pay for 44 pounds of methamphetamine, did he?

**[BULL]:**  No.  That's what I'm trying—

**[MS. GRAVISS]:**  But you did—

**[BULL]:**  No.

**[MS. GRAVISS]:**   —because you laundered approximately $500,000 worth of cash between 2016 and 2020 and you had multiple, multiple tens of thousands of dollars over these years; correct?

**[BULL]:**  From marijuana, ma'am.

Crim. doc. 358, Sent'g Hr'g Tr. at 18:17–18:25.  Bull's ineffective-assistance claim fails, as he again cannot show a reasonable probability that, "but for *counsel's* unprofessional errors, the result of the proceeding would have been different."  *Hill*, 474 U.S. at 57 (emphasis added) (citation omitted).  And because the record contradicts Bull's claims, he is not entitled to an evidentiary hearing on this ground.  *Adams*, 869 F.3d at 635.

> **5.**      **Coercive pressure**

Bull next argues that his guilty plea was not fully informed and voluntary because "coercive pressure influenced his decision-making."  Civ. doc. 1-1 at 15.  This coercive pressure, he states, resulted from "government efforts to subpoena his wife for trial, despite counsel being in possession of their marriage certificate and a supporting affidavit describing the emotional and financial harm caused by that action."  *Id.*  Specifically, Bull states that the United States "flew to California" and "served a subpoena on [his wife] to exercise pressure on [him] to plead guilty."  *Id.* at 17.  He further asserts that "[t]here was no explanation . . . as to defenses he may have on these external pressures."  *Id.*  Bull reiterates several of these points in his affidavit, *see id.* at 33, and ultimately argues that this "external pressure" from the United States "led [him] to plead guilty, waiving his initial desire to proceed to trial," *id.* at 17; *see also id.* at 33 ("Without

25

adequate legal guidance, I was left to make uninformed decisions under duress, ultimately waiving my right to trial due to the pressure placed upon me.").

In its response, the United States relies on the affidavit of Mr. Harvath, which states that counsel advised Bull's wife to "seek her own counsel" and said that her being subpoenaed "was never a concern . . . as she would have exercised her spousal privilege to refuse to testify."  Doc. 13 at 20–21; doc. 13-2 at ¶ 11.  Mr. Harvath further states in his affidavit that he does not recall if he and Mr. Schoeneberg advised Bull's wife personally, "or if that was a conversation [they] had with Mr. Bull to convey to his wife."  Doc. 13-2 at ¶ 11.

While Bull and Mr. Harvath's affidavits present competing versions of the facts, the Court need not resolve this factual dispute because the record contradicts Bull's allegations.  At his first *Frye* hearing in February 2022, Bull informed the Court about the United States' efforts to subpoena his wife for trial:

| | |
|---|---|
| **THE COURT:** | And is your mind clear today?  Are you feeling well and are you ready to proceed? |
| **[BULL]:** | I don't know how to answer that because my mind is not that clear at this moment, but yes, it's clear enough to understand what you are saying. |
| **THE COURT**: | Well, tell me why your mind isn't clear. |
| **[BULL]:** | Well, I mean, I'm under a little stress and duress from the whole situation and everything that's happening.  It's happening so fast that I hadn't had a chance to consult with my wife this agreement which was brought to me yesterday and I read it over.  There was a shake-down at the facility.  I didn't get a chance to talk to my wife about it, and I'm under the impression that Jeannette Graviss had been out to LA and served my wife a subpoena to testify in my trial, and after that, I was notified that they would go ahead and try to indict her if I didn't—if I tried to go to trial . . . . |

Crim. doc. 302, *Frye* Hr'g Tr. at 7:7–7:23.  Bull informed the Court that he no longer wished to plead guilty because of the coercive pressure he felt from the United States' actions:

> **[BULL]:** And I just needed time.  I was asking to put this off so I can look over this, talk it over with my family, but they are giving no time on the plea.  So actually, I don't even want to take the plea because it's too much duress, and a situation like this is the rest of my life . . . .

*Id.* at 7:24–8:4.  Bull then decided to proceed to trial.  *Id.* at 10:11–10:12.

But at his plea hearing two weeks later, Bull confirmed that, other than his Stipulation of Facts, there were no other agreements, deals, or understandings that affected him, nor were there any promises, representations, or assurances to get him to sign the Stipulation of Facts or plead guilty:

> **THE COURT:** Did anyone force you to sign this Stipulation of Facts in any way?
>
> **[BULL]:** No.
>
> **THE COURT:** And so with this—other than this Stipulation of Facts, is there any—are there any other agreements, deals or understandings that exist or you believe exist in any way that affect you in this case?
>
> **[BULL]:** No.
>
> **THE COURT:** And other than this Stipulation of Facts, has anyone at any time made any other or different promises, representations or assurances to you to get you to sign this Stipulation of Facts?
>
> **[BULL]:** No.
>
> **THE COURT:** Or to enter a plea of guilty in this case?
>
> **[BULL]:** No.

Crim. doc. 356, Plea Hr'g Tr. at 16:15–17:5.  Also, before pleading guilty, Bull confirmed that he was fully satisfied with his counsel, *id.* at 9:19–9:22, and that he had no complaint against

27

them "for anything they've done or failed to do or anything else at all," *id.* at 9:15–9:18.  Indeed, Bull went so far as to say that his counsel "ha[d] been doing a marvelous job."  *Id.* at 10:1–10:2. And all this happened *after* Bull had become aware of the United States' allegedly coercive behavior.

Bull's representations at his plea hearing carry a "strong presumption of verity."  *Adams*, 869 F.3d at 635.  And Bull does not rebut this presumption by pointing to specific facts showing "misunderstanding, duress, or misrepresentation by others."  *Blackledge*, 431 U.S. at 74.  For instance, he does not argue that the United States engaged in further coercive behavior between his *Frye* hearing and sentencing.  Nor does he argue that his counsel provided him incorrect advice upon which he relied in pleading guilty.  Instead, Bull merely states that there was "no explanation" as to "defenses he may have on these external pressures."  Doc. 1-1 at 17.  But importantly, Bull would have been aware of this fact after his *Frye* hearing, well before pleading guilty (and, thus, well before affirming under oath that he was satisfied with his counsel's performance).

The Court need not accept Bull's "post hoc assertions . . . about how he would have pleaded but for his attorney's deficiencies," because the Court finds that "contemporaneous evidence" in the record supports Bull's desire to plead guilty.  *Thompson*, 872 F.3d at 567 (quoting *Lee*, 582 U.S. at 369).  Bull's allegations in his 2255 motion "cannot be accepted as true because they are contradicted by the record," *Sellner*, 773 F.3d at 930, so he is not entitled to an evidentiary hearing on this ground.

**B.      Whether Bull's counsel was ineffective for failing to secure Charles Strozier as a witness at sentencing**

Bull next asserts that his counsel was ineffective for failing to secure the testimony of his co-conspirator, Charles Strozier, for Bull's sentencing hearing.  Civ. doc. 1-1 at 17.  The Court

28

originally scheduled Strozier's sentencing to occur just before Bull's, on June 21, 2022. *See* crim. docs. 301, 328. But on June 16, 2022, Strozier's counsel filed a motion to continue Strozier's sentencing, crim. doc. 325, which the Court granted the next day, crim. doc. 327. At Bull's sentencing, his counsel made an oral motion for a continuance, stating that they "believe[d] that Mr. Strozier would testify in the defense of Mr. Bull after he was sentenced" and no longer represented by counsel. Crim. doc. 358, Sent'g Hr'g Tr. at 4:15–4:25. The Court denied the motion. *Id.* at 28:9–28:13.

Bull argues that counsel's performance was deficient because, despite knowing that Strozier's sentencing had been continued, counsel (1) did not speak to Strozier ahead of sentencing to ensure his availability, civ. doc. 1-1 at 18; (2) did not subpoena Strozier to testify at Bull's sentencing, *id.*; and (3) did not timely request a continuance, *id.* at 20. And these failures prejudiced Bull, he argues, because Strozier's testimony "would have had a direct and significant impact on [his] sentence." *Id.* This is because Strozier "was in a unique position to discredit the government's assertion that [Bull] was responsible for substantial quantities of methamphetamine, cocaine, and fentanyl." *Id.* In other words, Strozier's testimony would have provided Bull with "a meaningful opportunity to properly challenge the drug[-]weight calculation," as Strozier "would have provided that Bull was not involved with any [narcotics] whatsoever in his residence." *Id.* Bull provides similar information in his affidavit. *See id.* at 33–35. Bull also submits a sworn affidavit from Strozier, *see id.* at 36–39, in which Strozier states, among other things, that he told DEA Task Force Officer Eric Lanham in a prior interview that Bull had "no knowledge about anything that was in [his] residence," *id.* at 36–37.

Missing from these affidavits, however, is any assertion that Strozier would have agreed to testify at Bull's sentencing hearing. *See id.* at 32–39; *see also Hadley v. Groose*, 97 F.3d

29

1131, 1135 (8th Cir. 1996) ("To establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified . . . ."). And the record shows that this possibility was doubtful. While Bull's counsel stated that they believed Strozier would testify in Bull's defense after Strozier was sentenced, *see* crim. doc. 358 at 4:15–4:25, 24:11–24:15, counsel acknowledged that Strozier's attorney "ha[d] not authorized [them] to speak with Mr. Strozier," *id.* at 25:4–25:5.

Additionally, counsel for the United States noted that Strozier's counsel "said it was not his intention to recommend that Charles Strozier were to testify at Bull's sentencing either before or after he was sentenced" due to possible obstruction and perjury issues. *See id.* at 25:19–26:18. The Eighth Circuit also found it "doubtful that Strozier would have ever testified at Bull's sentencing, regardless of when it was held." *Bull*, 2024 WL 378006, at *2. So, assuming counsel's performance was deficient, Bull cannot show prejudice on this ground. *Hadley*, 97 F.3d at 1135; *Jeffries*, 721 F.3d at 1014. His claim therefore fails.

## C. Whether Bull's counsel was ineffective by failing to challenge drug-quantity findings at sentencing

Bull's third and fourth claims both involve the drug-quantity findings the Court made at sentencing, so the Court addresses them together. For Ground Three, Bull argues that counsel was ineffective "by failing to maintain objections to the drug-quantity findings or by effectively withdrawing them at sentencing." Civ. doc. 1 at 7. In support of this point, Bull cites the following lines from his sentencing hearing:

> **THE COURT:** So your objection generally to the PSR is just that the defendant is not responsible for the meth, it's not to the actual quantity of the meth that was seized?
>
> **MR. HARVATH:** That's correct, Your Honor. To clarify, essentially our objection is that Mr. Bull admits only the evidence stipulated to in the joint stipulation of facts. He's objecting to any facts

|  |  |
|---|---|
|  | beyond what was previously stipulated to, specifically his involvement in the sale and distribution of any controlled substances other than marijuana. |
| THE COURT: | Those are two different things. What I understand Ms. Graviss to be asking you is: With respect to the other substances besides marijuana, is there any objection to the quantities? |
| MR. HARVATH: | No, Your Honor. Mr. Bull contends that he was not involved in any amounts of any controlled substance, regardless of the amount, other than marijuana. |

Crim. doc. 358, Sent'g Hr'g Tr. at 81:20–82:11. He then argues that, "[b]y failing to maintain and argue these objections, defense counsel effectively conceded the government's drug[-]weight calculations without requiring evidentiary proof or cross-examination." Civ. doc. 1-1 at 23.

For Ground Four, Bull argues that counsel "was ineffective for failing to challenge the drug-quantity findings related to non-marijuana controlled substances." Civ. doc. 1 at 8. He then posits that "[t]he government's attribution of these extra drug quantities was not adequately challenged by defense counsel, effectively conceding a higher base offense level without proper evidentiary scrutiny." Civ. doc. 1-1 at 24. The impact of these alleged concessions, Bull posits, was substantial, because "without the additional drug quantities, [his] sentencing range would have been 108–135 months, yet he was sentenced to 300 months, an increase of more than 13 years." *Id.* at 23; *see also id.* at 24–25.

While the Court recognizes that "[c]ounsel may afford ineffective assistance by failing to object at sentencing," *Auman v. United States*, 67 F.3d 157, 162 (8th Cir. 1995), this is not such a case. In Bull's PSR objections, his counsel stated that Bull "denies his involvement in any allegations involving methamphetamine, cocaine, fentanyl, and heroin," crim. doc. 312 at 1, and that Bull "contends that his involvement was limited to the allegations involving

31

[m]arijuana," *id.* at 2. And although counsel later stated during Bull's sentencing hearing that they were not challenging the quantities of drugs the United States seized, they still maintained that Bull "was not involved in any amounts of any controlled substance, *regardless of the amount*, other than marijuana." Crim. doc. 358, Sent'g Hr'g Tr. at 81:20–82:11 (emphasis added).

Thus, Bull's argument is not that his counsel failed to object whatsoever to additional drug quantities being attributed to Bull. Rather, his argument is that counsel could have objected differently—that is, by challenging the specific quantities of drugs that the United States seized. Bull's argument therefore attacks his counsel's strategic decisions at sentencing. But these decisions are "virtually unchallengeable" unless Bull shows that counsel failed to investigate the "law and facts relevant to plausible options." *Rice*, 449 F.3d at 897. Bull has failed to make this showing. *See* civ. doc. 1-1 at 22–25. He therefore cannot rebut the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). His claim fails.

### D.      Whether Bull's counsel was ineffective by failing to object to the leadership enhancement

For his fifth claim, Bull argues that his counsel was ineffective by failing to object to the four-level leadership enhancement the Court applied under U.S.S.G. § 3B1.1(a). Civ. doc. 1-1 at 25. Specifically, he argues that counsel was deficient by (1) "failing to object to the leadership enhancement despite the lack of concrete evidence supporting it," (2) failing to cross-examine witnesses, (3) failing to challenge the PSR findings, and (4) failing to call Charles Strozier and Sakeena Williams as witnesses to contradict the United States' evidence. *Id.* at 26.

As to this last point, Bull alleges that Strozier's affidavit "disavowed [Bull's] involvement in the offense," because Strozier states that he told officers that Bull "had no

32

knowledge of anything that was in [Strozier's] residence." *Id.*; *see also id.* at 36–37 (Strozier's affidavit). Thus, by presenting Strozier at sentencing, Bull argues, "the leadership role could have been contested, thus the sentence reduced." *Id.* at 26. Bull similarly contends that Williams' affidavit "shows that she had personal knowledge directly contradicting the government's assertions regarding [his] control over others and involvement in a criminal enterprise at the residence of [Strozier]." *Id.* This is because, despite having "an intimate relationship" with Bull from 2018 to 2020, Williams "attests that she never once visited [Strozier's] residence, was never involved in any drug activity, and had no knowledge of any such conduct involving [Bull]." *Id.*; *see also id.* at 40 (Williams's affidavit). Bull argues that counsel's deficient performance prejudiced him by leading to "a significantly higher sentence." *Id.* at 28.

The record refutes Bull's claims. Bull's counsel initially challenged the leadership enhancement by filing written objections to the PSR. *See* crim. doc. 312 at 2. Counsel maintained this objection at sentencing. *See* crim. doc. 358, Sent'g Hr'g Tr. at 132:13–132:19. Further, as noted above, Bull has not shown that Strozier likely would have testified at his sentencing. *See id.* at 4:15–4:25, 25:19–26:18; civ. doc. 1-1 at 32–39; *Bull*, 2024 WL 378006, at *2; *Hadley*, 97 F.3d at 1135. And finally, although Bull argues that Williams's affidavit shows that she "had personal knowledge directly contradicting the government's assertions regarding [Bull's] control over others," civ. doc. 1-1 at 26, her affidavit does not go so far.

At most, Williams's affidavit states that she (1) had a personal relationship with Bull; (2) has never visited Strozier's residence; (3) does not know the address of Strozier's residence; (4) spoke with Bull's attorney; (5) had no knowledge of Bull's alleged criminal activity; (6) was aware that the United States alleged that Bull managed or directed Strozier's actions; and (7) was

33

not called to testify at trial or sentencing, "despite [her] willingness to do so." *Id.* at 40. Accepting Williams's assertions as true, her affidavit shows that she lacks personal knowledge of the events at issue in Bull's criminal case.

Thus, even if Williams had testified at Bull's sentencing as she now claims she was willing to do, she would have lacked the foundation necessary to testify regarding Bull's control over others and his knowledge of what was in Strozier's residence.   Bull fails to show that Williams's testimony "would have probably changed the outcome of the [sentencing]." *Hadley*, 97 F.3d at 1135 ("To prove prejudice from a trial attorney's failure to investigate potential witnesses, a petitioner must show . . . that their testimony would have probably changed the outcome of the trial." (citation modified)).  Bull therefore fails to show prejudice. *See id.*  And because Bull's allegations are "contradicted by the record," the Court need not hold an evidentiary hearing on this ground. *Adams*, 869 F.3d at 635.

E.      **Whether the cumulative impact of counsel's alleged errors warrants resentencing or an evidentiary hearing**

Bull lastly argues that the "cumulative impact" of counsel's errors warrants resentencing or an evidentiary hearing.  Civ. doc. 1 at 14.  But Eighth Circuit precedent forecloses this argument. *See United States v. Brown*, 528 F.3d 1030, 1034 (8th Cir. 2008) (noting that the Eighth Circuit has "repeatedly rejected the cumulative[-]error theory of post-conviction relief"); *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006).

IV.    **Certificate of appealability**

For the Court to issue a certificate of appealability, Bull must make a substantial showing that he suffered the denial of a constitutional right. *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).  A substantial showing means one indicating that reasonable jurists could debate the issues, a court could resolve the issues differently, or the issues deserve further proceedings. *Id.*

But as shown in the discussion above, Bull has not made such a showing.  Accordingly, the Court declines to issue a certificate of appealability.

## V.       Conclusion

The Court finds that the record conclusively establishes that section 2255 does not entitle Bull to relief or an evidentiary hearing.  Accordingly, the Court denies Bull's [1] Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.  A separate judgment accompanies this Memorandum and Order.

So ordered this 10th day of August 2026.

_____

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE